(No. 12017.—Reversed and remanded.)
CHARLES MATTHEW WILSON, Appellee, vs. THE CENTRAL TRUST COMPANY OF ILLINOIS, Appellant.

*Opinion filed October 21, 1918—Rehearing denied Dec. 5, 1918.*

1. REGISTRATION OF TITLE—*in suits respecting trust property the beneficiaries are necessary parties.* On application to register title based on a certain warranty deed, children of the grantor to whom she has devised the same property in trust are necessary parties, both to the original application and to a cross-application by the trustee to register the title based on the will, and the objection that they are not parties may be taken on appeal.

2. SAME—*when court should not register title in applicant.* The immediate grantee of one who has obtained a deed to property from her sister is not entitled to have his title registered, where the evidence shows, without doubt, that the sister was insane when the deed was executed and remained so until her death, and that the applicant's conveyance was not obtained by him in good faith or for valuable consideration.

APPEAL from the Circuit Court of Cook county; the Hon. FREDERICK A. SMITH, Judge, presiding.

MONTGOMERY, HART, SMITH & STEERE, for appellant.

ELLIS & LEWIS, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

This appeal is from a decree of the circuit court of Cook county ordering the registration of the title of the appellee to a tract of land in the town of Niles, in that county. Caroline Reid was the owner of the land on December 27, 1913, when she conveyed it to Charlotte W. Hanly, her sister, and the two principal questions presented are concerning her mental competency at that time and the good faith of appellee's claim as an innocent purchaser from Mrs. Hanly.

Caroline Reid died in 1915, leaving a will executed in 1911, by which she devised all her property in trust for the

benefit of her two children, to the Central Trust Company
of Illinois, which was also made executor. It answered the
petition of appellee, stating that Mrs. Reid was insane at
the date of the deed to Mrs. Hanly, who procured it with-
out consideration, by cunning, coercion and fraud; that the
appellee obtained his deed with notice, and that the convey-
ance from Mrs. Hanly to him was collusive and intended to
make him appear as an innocent purchaser for value though
he was not; that Mrs. Reid was adjudged insane, and on
February 1, 1915, Edward W. McGrew was appointed her
conservator; that he filed a bill to set aside the conveyance
of Mrs. Reid, which was dismissed without prejudice after
her death and a new suit for the same purpose was brought
by the Central Trust Company on May 11, 1916. A cross-
application was filed by the Central Trust Company for the
registration of the title in it, as trustee. Mrs. Hanly was
made a party to the cross-application and answered dis-
claiming any interest, and the appellee's application was or-
dered to stand as his answer. The cause was referred to
an examiner, who took the evidence and found that Mrs.
Reid was insane at the time of the execution of the deed
and that the proof was not sufficient to show the payment
of an adequate consideration by the appellee for the con-
veyance to him, but that the cross-petition did not make
parties the minor heirs of Mrs. Reid. The examiner recom-
mended that the application and cross-application be dis-
missed without prejudice. The court found that Mrs. Reid
was sane and ordered the appellee's title registered, and the
Central Trust Company appealed.

The property had been conveyed to Caroline Reid sev-
eral years before 1913 by her mother, who afterwards
brought an unsuccessful suit to have the conveyance set
aside. In 1913 Mrs. Reid lived in Niles, in a residence
which she owned, not a part of the property in question.
She was a widow forty-eight years old and had two chil-
dren, boys seven and nine years old, respectively. She had

two sisters,—Charlotte W. Hanly, who lived in Montana, and Mrs. McGrew, who lived in Chicago. In October, 1913, she moved to the village of Park Ridge, where she bought a house through an agent named Schiessle for $3000, paying $1000 cash, assuming $1500 incumbrance and giving judgment notes for $500. In her conduct of this purchase there was nothing which indicated unsoundness of mind to those with whom she was dealing. Soon after she came to Park Ridge a change took place in her habits. She had been ordinarily neat about her housekeeping and the care of herself and her children, but she took no care of her home at Park Ridge and permitted it to become and remain dirty. She became slovenly about her person and clothing and took no interest in her children, neglecting to get their meals for them or care for their persons. To Mr. Dickson, the pastor of the Methodist church, she complained that Schiessle had misrepresented to her the place which she had bought and that she had been deluded in her dealings with him, not only with reference to the value of the property but in regard to his personal intentions toward her. She had believed that Schiessle was an honorable man and had attempted to engage her affections in an honorable way. She said he had made love to her and she confessed to having a decided interest in him, but she said he was a scoundrel. She became almost hysterical. At another time she said she intended giving up her place at Park Ridge and moving again to Niles. Another time she said she wanted to get rid of her property. She felt that she was not going to live long, and asked if the Dicksons would not take charge of her boys. She became hysterical and threw herself upon the floor of the parlor, where she lay until Mrs. Dickson was called and helped her rise. Several times she expressed a desire to be rid of her property and any responsibility of caring for it. She wanted to get rid of the Park Ridge property on any terms and would be willing to make over her property to Dickson or anyone. Early in Dickson's ac-

quaintance with Mrs. Reid, some years before, she had told him there had been some trouble in the family over the division of the property but that she believed the division was just, as far as she was concerned; that the other members of the family proposed that she should make restitution to them, but that there was no restitution due to any person; that she received the property from her mother and proposed to retain it. In a conversation after moving to Park Ridge she said she thought she might as well make over the property to her sister, and afterward she proposed to make it over to anyone, saying that she was tired of the whole thing and would be glad to get rid of it to any person. Mrs. Reid had similar conversations with Fred I. Gillick, a banker and real estate dealer. She wanted him to prepare a deed of her property to Mrs. Hanly, but he refused, regarding her as insane. He informed Mrs. Hanly that Mrs. Reid was not in a condition to convey property. Mrs. Reid was continually coming to his office, going over these same matters in the same way, though he told her more than once that he could not devote any more time to her.

On December 13 Mrs. Reid wrote to her sister Mrs. Hanly that she was having an awful time,—was thinking strongly of suicide,—and knew that she had done wrong in her life and would give years of her life to recall the past. Soon afterward she telegraphed to Mrs. Hanly: "Come at once; in great trouble; will make good." On December 15 she wrote to her other sister, Mrs. McGrew, asking her forgiveness for the great wrong she had done her and asking her to try to come out the next day. Mrs. Hanly, in response to the letter and telegram, went to Chicago from her home in Big Timber, Montana, arriving December 17. She stayed at Mrs. Reid's house, taking entire charge of her and her children. On December 23 Mrs. McGrew and her son, Edward, who was a practicing lawyer, went to the home of Mrs. Reid and there was a family conference. Mrs. Reid said that everything was gone; that that awful Schiessle

had everything, and kept repeating, "that awful Schiessle."
She said that she did not have a dollar in the world; that
she was unable to sleep nights, was in a terrible mental con-
dition, a very sick woman, and wanted somebody to take
care of her beautiful children; that her children were now
idiots.   At first she said she did not have a dollar in the
world, and then she spoke of her property and wanted to
get rid of it.   She wanted to make a division of all she had.
Besides the land in question, which was fifty-two acres,
worth from $350 to $400 an acre, Mrs. Reid owned the
Park Ridge house; the homestead at Niles of two or three
acres, in which she had previously lived, worth $2500; a
piece of property on Sixteenth street, worth about $3500;
some lots of little value, and $2000 or $3000 in personal
property.   It was proposed to convey the Sixteenth street
property to Mrs. McGrew and the Niles farm of fifty-two
acres to Mrs. Hanly.   The McGrews wanted five acres of
the farm, but Mrs. Hanly would not consent to it.   McGrew
testified that he asked Mrs. Reid what property she had, and
Mrs. Hanly said: "Can't you see she is in no mental con-
dition to talk about property?  Shut up."  McGrew and
Mrs. Hanly then withdrew to the kitchen, where McGrew
said to Mrs. Hanly concerning Mrs. Reid, "She is as crazy
as a loon," and Mrs. Hanly replied, "Yes; she is in no
condition to talk about property."

McGrew took away with him the abstracts of title in
order to prepare deeds, but before his return the deed in
controversy had been executed on December 27.   Some
money which Mrs. Reid had in the bank was drawn out,
and on January 1, 1914, Mrs. Hanly left for her home
in Montana, accompanied by Mrs. Reid and the two boys.
One of the boys testified that at the Northwestern station,
in Chicago, Mrs. Hanly asked Mrs. Reid if she knew where
she was going, and Mrs. Reid replied that she did not; that
when told that she was going to Montana Mrs. Reid ran
away and it was some time before Mrs. Hanly got her back;

that while on the train going to Montana Mrs. Reid repeatedly tried to get off and fought with Mrs. Hanly, who at one time caught her, pulled her hair, bumped her head, set her down and made her stay. Mrs. Hanly and her husband were living on a ranch, and Mrs. Reid and her children lived there with them until March, when the Hanlys moved to the town of Big Timber, separated, and on April 28 were divorced. Mrs. Hanly, Mrs. Reid and the boys lived together at Big Timber until the end of June. About July 1 they took a trip through Yellowstone Park, and on their return stopped at Livingston and established their residence there. Evidence was introduced tending to show Mrs. Reid's insanity during all this time and that her mental condition was constantly growing worse. On September 12, 1914, on the complaint of Mrs. Hanly, Mrs. Reid was adjudged insane by the district court of Park county, Montana, and was committed to the insane asylum at Warm Springs, in that State, where she died on June 14, 1915. She was very badly demented on her admission and at no time was there a remission of the disease.

A. P. Stark, who was the judge of the sixth judicial district of Montana, testified that on September 10 Mrs. Hanly called upon him and stated that for several weeks her sister had wholly neglected to care for her person, was morose, did not talk with anyone, would not answer questions, threatened suicide and would not leave the bed; that it was necessary to remove her by main force in order to give her any care; that she required constant attention day and night, and that she had been insane for more than a year. On the hearing of the complaint she testified to the same things, and other witnesses were examined. Upon Mrs. Reid's admission to the hospital blood and spinal tests were made, which disclosed that she was suffering from paresis, caused by syphilis of the brain. Two physicians at the hospital testified she must have had paresis and have been insane and incapable of transacting business for a year

or more prior to the date of her admission to the asylum; that one afflicted with paresis is not capable of transacting business from the earliest period at which symptoms become manifest. A third physician testified hypothetically, assuming the correctness of the facts concerning Mrs. Reid's condition as set forth by the examining physicians at the hospital, that he was of the opinion that Mrs. Reid must have had paresis when the change appeared in her conduct and habits of life which took place about the time of her removal to Park Ridge. On the other hand, two physicians testified on behalf of appellee that in their opinion, assuming the correctness of the facts as stated to them, Mrs. Reid was not suffering from paresis, and that there was nothing in the facts assumed to indicate that she was insane on December 27, 1913.

On the hearing before the court sixteen witnesses were heard as to Mrs. Reid's mental condition, including the two medical experts who testified on behalf of the appellee, and Mrs. Hanly, whose testimony the examiner held inadmissible because she was a party to the suit, the adverse party being the trustee of a deceased person. None of these witnesses except Mrs. Hanly had an opportunity to judge as to Mrs. Reid's mental condition at about the time of the execution of the deed, except in the most casual way. The experts all agree that she was suffering from syphilis of the brain, of which paresis is a late manifestation, and that syphilis would affect, and did affect, her mental condition previous to her death. There is a difference of opinion as to whether or not she had paresis but none that she was insane for months before her death because of syphilis. There is a difference of expert opinion as to whether or not a conclusion of insanity in December, 1913, could be drawn from the evidence, but in view of all the evidence as to her actions during the nine months preceding her admission to the insane asylum in a hopelessly demented condition and the progress of her disease, it clearly appears that

285 — 28

Mrs. Reid was mentally incompetent to make the deed to Mrs. Hanly on December 27, 1913.

The testimony of Mrs. Hanly, if admissible, is not entitled to much weight. Her testimony is in direct conflict with the testimony of Judge Stark and the physicians who held the inquest upon her sister, as well as her own prior statements. She testified that at the time she visited Mrs. Reid in Park Ridge Mrs. Reid slept fine, was not afflicted seriously with sleeplessness and was not physically or mentally ill. She also testified that Mrs. Reid had called a doctor one night because she could not sleep. On December 29, 1913, she wrote a letter to her husband in which she said: "I am living in a chamber of horrors,—two wayward, awful children to contend with and a poor sick sister to look after day and night, far away from my home, cold, freezing weather, and trying to do everything without any money, as she has none with her and I cannot get her to sign a check. The first of the month there will be some rent due and I hope then to get things straightened out enough to get away. I dare not say a word about her mental condition, as that will only make matters worse, as everybody is always ready to interfere in other people's business if they think there is any property or money at stake, so I have to be doubly careful and endure everything and say nothing. Carrie is in a pretty bad way sometimes; at other times she seems to be nearly all right. She is the worst at night, as I am up nearly all night with her. I haven't had a night's sleep yet and am sleeping on a couch, which I never could do. * * * There is something more I want to tell you about but I do not dare write it, so I will wait until I get back."

The conveyance from Mrs. Hanly to appellee is dated December 15, 1914. It bears a certificate of acknowledgment before a notary public of British Columbia dated February 22, 1915, and it was filed for record in Cook county on June 24, 1915. It is an ordinary statutory warranty

deed, naming a consideration of one dollar and other good and valuable considerations. The appellee testified that he first met Mrs. Hanly the day the deed was acknowledged, February 22, 1915, or the day before, at Massett, Queen Charlotte Islands, British Columbia, where he lived. These are a group of islands in the Pacific Ocean about eighty-four miles west of Prince Rupert. The appellee claimed to be the owner of about 500 lots,—a part of the town site of Delkatlah,—and in August, 1914, he caused to be inserted in the *San Francisco Examiner* an advertisement offering them for sale for $10,000. Several letters purporting to have passed between appellee and Mrs. Hanly were introduced in evidence, and a deed from Wilson to Mrs. Hanly for certain blocks and lots in Delkatlah, dated December 13, 1914, and bearing a certificate of acknowledgment dated September 30, 1915. This deed bore the name of T. L. Williams as an attesting witness. The appellee claims that these deeds were exchanged at Livingston, Montana, in December, 1914; that he gave to Capt. Williams, at Massett, his deed, together with $2500 in Canadian and American currency, to take to Livingston and deliver to Mrs. Hanly, in exchange for which Williams received Mrs. Hanly's deed and mailed it to the appellee. The deed, and a receipt from Mrs. Hanly dated December 21, 1914, for $2500, were produced in evidence.

The appellant desired to investigate the question of the good faith of the appellee's purchase with a view of determining whether it should further prosecute its bill to set aside the conveyance to Mrs. Hanly, and an interview was therefore brought about on July 7, 1916, between the appellee and his attorney on the one part and the estate officer and attorney of the appellant on the other, in which the appellee undertook to tell the facts in regard to the transaction. He said that Capt. Williams, who took the deed from Massett to Livingston, was an English army officer who had lived in the island a long time and with whom

the appellee was well acquainted, but that it was extremely
doubtful about being able to get in communication with him,
as he had left this continent by way of New York soon
after the deed was signed to go into the English army, and
the appellee did not know how to find him.   The appellee
on his first examination as a witness stated that he could
not tell Capt. Williams' full name; that his initials were
L. T.; that the appellee could not tell his address though
he had tried to get it; that Williams lived in Queen Char-
lotte Islands for a while, and the appellee believed he was
there in 1914 and left somewhere·about that time to join
the Canadian army, but was turned down at first because
of his size and had to make application several times.   The
appellee said that the $2500 in currency which he sent to
Mrs. Hanly by Capt. Williams he kept in the safe of the
post-master at Massett, James Martin, though Martin tes-
tified that he had no recollection of keeping any money for
the appellee.   The appellee made no effort to ascertain the
condition or value of the Cook county land or the state of
the title other than to request information of Henry John-
son, who was apparently a casual acquaintance, a real es-
tate speculator who followed real estate booms, whom the
appellee last heard of as going from San Diego to South
America.   Johnson wrote a letter to appellee, but it con-
veyed no information about the property which was of any
value or which a man of any business judgment would act
on as a basis for the payment to a stranger of $2500 in
cash or for the conveyance of property of any value.

The depositions of a number of witnesses of many
years' residence in Queen Charlotte Islands were taken.
They knew practically all the inhabitants, of whom there
were in 1914 from twelve to seventeen hundred.   The only
white man on the islands named Williams was Trevor L.
Williams, who was a man five feet four or five inches tall,
weighing about 100 pounds, and often called T. L. or Tim-
ber Limit Williams.   He was living in the islands in 1914

and left about that time to join the English army.   He was
not a captain and was not known as a captain while liv-
ing there.

The attorneys for the appellant having got in com-
munication with Capt. Williams received from him the fol-
lowing letter, addressed to them from "25 Northumberland
Fusiliers, British Expeditionary Force, France, 25 Septem.
1916," and signed "T. L. Williams:"

"DEAR SIRS:—Your letter of the 6th inst. referring to Charles
M. Wilson and the property of two children has just been for-
warded to me by my wife. In reply to your queries: I left Van-
couver in January, 1915,—the exact day I cannot give now. I trav-
eled across Canada all the way by the C. P. R. from Vancouver
to St. Johns, New Brunswick, and sailed from St. Johns at the end
of January for England. I have not been in the United States of
America since 1908. I have never been to Livingston, Montana.
I never heard of Mrs. Hanly before receipt of your letter of the
6th inst. and have never delivered $2500 cash for Mr. Wilson. I
am writing in the trenches and would not be considered a good
'life,' but have lasted long enough to disappoint Mr. Wilson's hope
that I would not be alive to refute his fabrication."

It was stipulated that the letter might be admitted in
evidence and that T. L. Williams would testify to what it
contained.   Thereupon appellee declared that the signature
to this letter was not that of the Capt. Williams he knew,
and he proceeded to describe another Capt. Williams,—a
man whose initials or first name he did not know, with
whom he had spent considerable time in the woods of the
islands, a large man about forty years of age, about five
feet eight inches or a little more in height and weighing
150 or 165 pounds, ruddy and strong, who, as far as the
appellee knew, had not been in the army.   He also there-
upon produced two letters from this Capt. Williams,—one
purporting to have been written on a Northern Pacific train
on December 24, 1914, and enclosing Mrs. Hanly's deed and
receipt for the $2500, and the other purporting to be writ-
ten from the Canadian forces in France on February 25,
1916.   These letters do not strengthen the appellee's case,
for their genuineness depends entirely upon his testimony.

After the interview with the appellant's attorney and estate officer, when the appellee exhibited his deed and undertook to give them information which would satisfy them of his good faith and would cause the appellant to dismiss its suit to set aside the deed, the appellee wrote to the registrar of titles at Prince Rupert, stating that a certain trust company in Chicago was writing to him for information about the appellee's holdings at Delkatlah and the portion of the town site owned by him, and that it was a piece of impertinence which he would be glad if the registrar would not gratify, asking him to give an evasive answer and state that he did not know what lots were in the appellee's name. He also wrote to the post-master, referring to the trust company's litigation and asking him to give the company no information, and if he knew of its writing to others, to tell them to give no information. In this letter he asked for the address of T. L. Williams, and asked particularly if the trust company wrote for any addresses of people he had spoken of in court or elsewhere, that the post-master would refuse to give them. He also wrote to Charles Harrison asking for Trevor Williams' address. It was Harrison who gave Capt. Trevor L. Williams' address to the attorneys for the appellant. The appellee claimed not to have known Trevor L. Williams by that name, though he did know him as Timber Limit Williams and T. L. Williams. He refers to him as a little man. He did not know the Christian name or the initials of the other supposed Capt. Williams.

The inconsistencies of the appellee's testimony are irreconcilable. No reliance can be placed upon his statements, which seem to be made only with reference to the emergency at the time they were made. They cannot be made the basis of a decree in his favor and they are not corroborated by credible evidence. His vague, uncertain, contradictory and evasive statements in regard to the transaction and in regard to the supposed Capt. Williams, and his ef-

forts to deceive and mislead the appellant, together with the improbable character of the transaction itself, lead to the conviction that the conveyance to him from Mrs. Hanly was not made in good faith and upon a valid consideration.

All persons having or claiming any estate or interest in land are required to be made parties to an application for the registration of the title. The general rule is, that in all suits respecting the trust property, whether brought by or against the trustee, the beneficiaries are necessary parties, and the objection on account of their not being parties may be taken on appeal. (*Dubs* v. *Egli*, 167 Ill. 514.) This rule applies to proceedings for the registration of title. The two children of Mrs. Reid are the beneficiaries of the trust created by her will and are necessary parties both to the application and the cross-application.

The decree is reversed and the cause remanded.

*Reversed and remanded.*